**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

Todd Svec,

          Plaintiff,

v.

Brett Davis, et al.,

          Defendants.

No. CV-23-01116-PHX-DWL

**ORDER**

      In 2015, Plaintiff Todd Svec ("Svec") and Defendant Brett Davis ("Davis") met at a pinball show in Texas. Starting in 2019, Svec and Davis began discussing the possibility of forming a partnership to design, source, and sell pinball products under Davis's brand, XPin, and through Davis's company, 21 Electronics, LLC ("21 Electronics"). Svec and Davis later signed a "notice to serve as a letter of intent" ("the LOI"), which contemplated a payment from Svec to Davis of $30,000 that Svec later paid. After this payment, the parties began business operations together. By early 2022, however, the relationship began to fall apart.

      In this action, Svec has sued Davis under a variety of legal theories, most of which are predicated upon Svec having become a 50% owner of 21 Electronics via the $30,000 payment. Now pending before the Court are two motions: (1) Svec's motion for summary judgment on the issue of his ownership of 21 Electronics and on his claim for an accounting; and (2) Svec's motion to strike a declaration that Davis submitted in response to the summary judgment motion. For the reasons that follow, both motions are granted.

**BACKGROUND**

I.    <u>Facts</u>

Svec resides in Missouri (Doc. 1 ¶ 1; Doc. 25 at 1 ¶ 2), where he owns and operates Big Daddy Enterprises, a company "in the business of selling pinball parts and supplies to the public" (Doc. 1 ¶ 9; Doc. 25 at 2 ¶ 4).

Davis resides in Arizona.  (Doc. 1 ¶ 2; Doc. 25 at 1 ¶ 2.)  Davis has, at all times relevant to this dispute, "been in the business of sourcing pinball parts, including circuit boards, and selling them to the public under the 'XPin' brand."  (Doc. 1 ¶ 10; Doc. 25 at 2 ¶ 4.)  Davis sold XPin products through his separate company, 21 Electronics.  (Doc. 25 at 9 ¶¶ 8-9; Doc. 26 at 2 ¶ 9.)

Defendants Joy Davis ("Joy") and Collin Davis ("Collin")—Davis's wife and son, respectively—also reside in Arizona and worked with Davis.  (Doc. 1 ¶¶ 3-4, 26, 29, 30; Doc. 25 at 1 ¶ 2; *id.* at 4 ¶¶ 15, 18, 19; *id.* at 14 ¶ 49; Doc. 26 at 8 ¶ 49.)

Defendant JCB Manufacturing, LLC ("JCB") is an Arizona limited liability company.  (Doc. 1 ¶ 5; Doc. 25 at 1 ¶ 2.)

In March 2015, Svec and Davis met at a pinball show in Texas and began "preliminary discussions concerning Svec selling and distributing [Davis's] XPin products."  (Doc. 1 ¶ 11; Doc. 25 at 2 ¶ 4.)

"Beginning in mid-2019, [Svec] and [Davis] began discussing the possibility of forming a partnership to design, source and sell XPin-branded pinball parts."  (Doc. 1 ¶ 12; Doc. 25 at 2 ¶ 4.)

"Over the course of the next few months, [Svec] and [Davis] discussed the terms of their partnership and agreed that [Svec] would contribute thirty thousand dollars ($30,000) as a 'buy-in' of the XPin business in exchange for ownership of half of the partnership and/or company."  (Doc. 1 ¶ 13; Doc. 25 at 2 ¶ 4.)

On July 11, 2020, as part of these discussions, Davis sent Svec an email outlining how the parties planned to move forward with their business relationship.  That email included the following passage:

Obviously first off is that a bill of sale from ME to you for $30k which constitutes 50% of XPIN/21-Electronics ownership. This then infers that my ownership is also $30K. If I understand correctly we will need to make some sort of statement saying that there are 60K shares and a share is worth $1. Also a statement saying assets of the company include intellectual property, equipment, finished goods, raw materials. This should cover the first step and getting them out of the picture except from a support standpoint.

The second step is to spell out our relationship, which can happen after step one is completed. We both agree we are on the same page, which is a big plus, but just saying that doesn't make it so. Too [sic] protect us both, we need to spell out the key points, particularly how we handle profit revenue, resellers, who is responsible for what, etc. Unlike the original agreement I entered into with Chriss/Nathan which was 22 pages of legal speech where I had to go to an attorney, I would like to see ours grounded in common sense. Those big documents to me are only for those individuals that are going into relationships thinking they are going to screw someone or are afraid of being screwed, which then sets the stage for mistrust right from the beginning.

(Doc. 56-2 at 3.)

On July 24, 2020, continuing these discussions, Svec sent Davis an email requesting more detail on what he would receive in exchange for his payment of $30,000, specifically "the current level of inventory value, not retail" and "the value of a [sic] assets or whatever." (*Id.*) He specified that "[t]hese can be rough numbers, and vague." (*Id.*)

That same day, Davis sent Svec a response email outlining some terms of the proposed agreement and inventorying 21 Electronics' assets:

Okay, $30K = 50% of XPin and all assets

These are the totals so essentially you would own 50% of it:

- Finished good product inventory is sitting right now ~$30K, retail value ~90K.
- Raw Materials for product assembly ~$20K
- Equipment/tools/support tools is ~30K (Dip Solder system, Pick' n' place, reflow oven, etc)
- Test equipment, misc ~1K
- All XPin intellectual property, value tough to determine because it is subjective. This IP is structured such that you can take any single board and walk it to a contract manufacturer and they could assemble it. Jim may have given you schematics, but that doesn't mean you have everything you need to manufacture the board.

- 3 -

(*Id.* at 2.)

On July 27, 2020, continuing these discussions, Davis sent Svec an amended partnership agreement addressing issues like "profit and dispersion." (Doc. 56-3 at 2.) In an accompanying email, Davis stated: "[W]ill be needed when we formalize the business LLC or S corp." (*Id.*)

On August 11, 2020, Svec and Davis executed the LOI, which provides as follows:

> This notice is to serve as a letter of intent concerning the sale of 50% Member ownership of 21-Electronics which includes all inventory, assets, fixtures, intellectual property and equipment currently owned by Brett Davis, valued at $60,000, for the development of XPin related products, for the sum total amount of $30,000. At the conclusion of this sale/transaction, 21-Electronics LLC will have the organizational structure as follows:
>
> Todd Svec – 50% Member/Owner
> Brett Davis – 50% Member/Owner
>
> Brett Davis will continue outside consulting and contracting opportunities under the LLC business name of BD Engineering LLC. Any development of pinball related products utilizing the XPin brand name will be owned as intellectual property of 21 Electronics. Todd Svec will continue current and future Big Daddy pinball sales and opportunities.
>
> These changes will be effective as of the date of the financial transaction on August 13, 2020 following which additional partnership agreements will be constructed and put into place.

(Doc. 53-3 at 8.)

On August 13, 2020, Svec paid Davis the agreed-upon $30,000. (Doc. 53-1 at 18.)

After that date, although the parties signed no further documents, Davis repeatedly referred to Svec as an "equal partner" and "50 percent owner" of 21 Electronics. (Doc. 53-1 at 25, 27, 28, 29.)

During the ensuing months, Svec "promoted the XPin brand on multiple websites, including Facebook, eBay, Pinside.com, and his own site, www.BigDaddy-Enterprises.com, and others, and he also promoted the brand via word of mouth and other means." (Doc. 1 ¶ 23; Doc. 25 at 2 ¶ 13.) Svec also "included XPin marketing and

promotional materials, such as XPin decals, can koozies, posters and tee shirts, in almost all orders from Big Daddy Enterprises." (Doc. 1 ¶ 24; Doc. 25 at 2 ¶ 13.)

During this period, Svec was granted access to "certain 21 Electronics accounts for the purpose of monitoring and assisting with product distribution, such as the shipping software, Facebook page, XPinpinball.com (administrator access) and Paypall business account." (Doc. 25 at 10 ¶ 20; Doc. 26 ¶ 20.) Despite his several requests, however, Svec was never granted access to the 21 Electronics bank account at Wells Fargo. (Doc. 25 at 10 ¶¶ 18-20; Doc. 26 ¶¶ 18, 20.)

On September 3, 2020, Davis sent Svec the following email requesting that Svec sign the formal partnership agreement and explaining the reasons that such formal paperwork was needed:

> Okay, I am sending this again but it is only because we still need to discuss this and get the formal paperwork in place. The reason is that I had a conversation with my Tax Attorney on all of the insanity that is in my life so I don't screw up anything for the end of the year.
>
> A couple of things that were discussed:
>
> - With the 21E partnership agreement dissolution with Chris/Nathan, I am now listed as sole proprietor of 21E.
> - We will need to file new articles stating our partnership, costs $50, but AZ requires a formal agreement as a formality to be filed with the new articles.
> - This all needs to be done before the end of the year, otherwise I personally have to file what he called a Q-doc which then puts all of the revenue of 21E and associated tax liability on my shoulders. OUCH!
> - My wife is adamant that we always pay our taxes, period. This year will be insane because of all of the changes that have occurred. I will have multiple 1099's, Schedule K, Schedule C, and probably others that I know nothing about. Loads of fun!

(Doc. 56-3 at 2.)

In calendar year 2021, 21 Electronics experienced an increase in revenue. (Doc. 1 ¶ 28; Doc. 25 at 3 ¶ 17.)

In late December 2021, Davis and the other Defendants traveled to Missouri to meet

with Svec and "do a review of certain XPin components in [Svec's] possession."  (Doc. 1 ¶ 29; Doc. 25 at 3 ¶ 18.)

Upon Defendants' return to Arizona, Svec began to receive less inventory from Defendants.  (Doc. 1 ¶ 31; Doc. 25 at 3 ¶ 20.)  The parties' relationship "began to sour over the following months."  (Doc. 1 ¶ 32; Doc. 25 at 3 ¶ 21.)

In January 2022, Davis began paying Svec "for some profits [from] the sale of XPin products."  (Doc. 1 ¶ 37; Doc. 25 at 3 ¶ 23.)

In July 2022, Davis "stopped sending payments to [Svec]."  (Doc. 1 ¶ 38; Doc. 25 at 3 ¶ 24.)  Around this time,[1] Svec "requested orders and invoices of inventory purchases from printed circuit board contractors/manufacturers, but [Davis] refused to provide such orders and invoices."  (Doc. 1 ¶ 39; Doc. 25 at 3 ¶ 25.)

After August 1, 2022, Svec received no further inventory from Defendants.  (Doc. 1 ¶ 44; Doc. 25 at 4 ¶ 27.)  In response, Svec "removed XPin products from his own websites and from his Ebay store."  (Doc. 25 at 13 ¶ 45; Doc. 26 ¶ 45.)

In November 2022, Davis formed JCB with his wife, Joy, and his son, Collin.  (Doc. 25 at 14 ¶ 49; Doc. 26 ¶ 49.)

II.    Procedural History

On March 22, 2023, Svec filed the Complaint in the United States District Court for the Western District of Missouri.  (Doc. 1.)  The Complaint asserts seven counts: breach of contract (Count One), breach of fiduciary duty (Counts Two, Three, and Four), conversion (Count Five), unjust enrichment (Count Six), and an action for accounting (Count Seven).  (Doc. 1 ¶¶ 48-107.)

On June 20, 2023, the case was transferred to the District of Arizona.  (Doc. 13.)

On August 17, 2023, Defendants filed their operative answer and counterclaim.  (Doc. 25.)    The counterclaim asserts five counts: declaratory relief (Count One), promissory estoppel (Count Two), breach of the covenant of good faith and fair dealing

---

[1]    The Complaint does not provide a date for this allegation, but it seems to refer to roughly the same time period as the preceding allegation.

1    (Count Three), unjust enrichment (Count Four), and conversion (Count Five).  (*Id.* at 14-
2    17 ¶¶ 51-76.)

3    　　　On August 18, 2023, Svec filed an answer to Defendants' counterclaim.  (Doc. 26.)

4    　　　On October 27, 2023, Svec moved for judgment on the pleadings as to Counts One
5    and Seven of the Complaint.  (Doc. 35.)

6    　　　On April 30, 2024, the Court denied Svec's motion for judgment on the pleadings.
7    (Doc. 43.)

8    　　　On November 12, 2024, Svec filed the pending motion for summary judgment on
9    Count One of Defendants' counterclaim and Count Seven of the Complaint and for partial
10   summary judgment on Counts One, Two, Three, and Four of the Complaint.  (Doc. 53.)

11   　　　On December 20, 2024, Defendants filed a response.  (Doc. 56.) As an attachment,
12   Defendants filed a declaration from Davis.  (Doc. 56-1.)

13   　　　On January 10, 2025, Svec filed the pending motion to strike Davis's declaration.
14   (Doc. 57.)

15   　　　On January 31, 2025, both pending motions became fully briefed.  (Docs. 58-60.)

16   　　　On July 2, 2025, the Court issued a tentative ruling.  (Doc. 62.)

17   　　　On July 15, 2025, the Court heard oral argument.  (Doc. 63.)

**DISCUSSION**

18

19   I.    Legal Standard

20   　　　"The court shall grant summary judgment if [a] movant shows that there is no
21   genuine dispute as to any material fact and the movant is entitled to judgment as a matter
22   of law."  Fed. R. Civ. P. 56(a).  "A fact is 'material' only if it might affect the outcome of
23   the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue
24   in the non-movant's favor."  *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d
25   1119, 1125 (9th Cir. 2014).  The court "must view the evidence in the light most favorable
26   to the nonmoving party and draw all reasonable inference in the nonmoving party's favor."
27   *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018).  "Summary judgment is
28   improper where divergent ultimate inferences may reasonably be drawn from the

1   undisputed facts." *Fresno Motors*, 771 F.3d at 1125 (internal quotation marks omitted).

2       A party moving for summary judgment "bears the initial responsibility of informing

3   the district court of the basis for its motion, and identifying those portions of 'the pleadings,

4   depositions, answers to interrogatories, and admissions on file, together with the affidavits,

5   if any,' which it believes demonstrate the absence of a genuine issue of material fact."

6   *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). *See*

7   *also Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

8       There is no issue for trial unless enough evidence favors the non-moving party.

9   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "If the evidence is merely

10  colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249-

11  50 (citations omitted). At the same time, the evidence of the non-movant is "to be believed,

12  and all justifiable inferences are to be drawn in [its] favor." *Id.* at 255. "[I]n ruling on a

13  motion for summary judgment, the judge must view the evidence presented through the

14  prism of the substantive evidentiary burden." *Id.* at 254. Thus, "the trial judge's summary

15  judgment inquiry as to whether a genuine issue exists will be whether the evidence

16  presented is such that a jury applying that evidentiary standard could reasonably find for

17  either the plaintiff or the defendant." *Id.* at 255.

18  II.   Svec's Interest In 21 Electronics

19      Svec contends that, pursuant to the terms of the LOI, he became a 50% owner of 21

20  Electronics upon paying $30,000 to Davis on August 13, 2020. Svec thus seeks summary

21  judgment as to the resolution of a particular issue—that "upon payment of the $30,000

22  [Svec] owned a 50% interest in 21 Electronics . . . and the XPin brand." (Doc. 53 at 12.)

23  All of the grounds on which Svec moves for summary judgment depend in whole or in part

24  on the resolution of this issue.[2]

25      …

26  _____

27  [2]   Svec may, under Rule 56(a) of the Federal Rules of Civil Procedure, properly request summary judgment on a discrete issue: "A party may move for summary judgment, identifying each claim or defense—*or the part of each claim or defense*—on which

28  summary judgment is sought." *Id.* The resolution of this issue in Svec's favor still leaves many issues unresolved for trial.

### A.    The Parties' Arguments

Svec argues that "there is no genuine dispute as to whether [he] acquired an interest in 21 Electronics, LLC, and the XPin brand" because "the pleadings demonstrate . . . 1) that [Svec] and [Davis] discussed becoming business partners and agreed that [Svec] would pay $30,000 for a 50% ownership interest in the XPin business, 2) that both [Svec] and [Davis] signed the August 11, 2020 contract/partnership agreement that set forth the agreement, and 3) that [Svec] paid [Davis] $30,000." (Doc. 53 at 7-9.)  Svec further argues that the record now "demonstrates that there is no genuine dispute as to the material facts relevant to the claim." (*Id.* at 9.)  Svec specifically argues that Davis's deposition testimony demonstrates that "the $30,000 dollars was intended to be a purchase of a 50 percent interest in 21 Electronics at the time that the contract was signed." (*Id.* at 11-12.)  Svec further argues that Davis's conduct after signing the LOI and receiving the $30,000 payment demonstrates that "the parties regarded the $30,000 payment as the purchase price for a 50% interest in 21 Electronics, LLC, and the XPin brand and they agreed that [Svec] owned 50% of both 21 Electronics, LLC, and the XPin brand." (*Id.* at 12.)  Last, Svec argues that "the sale was not, as [Davis] has asserted, expressly conditioned on executing a final partnership agreement or member purchase agreement memorializing the final terms of the venture" because "[t]here is no language conditioning the sale on any partnership agreements or invalidating the sale for the lack of any agreements.  Rather, the sale was complete upon the financial transaction and 'effective as of the date of the financial transaction on August 13, 2020.'  After the sale's completion, additional partnership agreements were to be constructed and put into place, but they would not affect the sale or the changes that were complete and effective as of the date of the financial transaction." (*Id.* at 14.)

In response, Defendants argue there is a genuine dispute regarding whether Davis, by signing the LOI, intended it to be a final binding agreement sufficient to transfer a 50% interest in 21 Electronics to Svec or whether it was intended as a mere letter of preliminary intent contingent upon the execution of further formal documents spelling out the terms of

a partnership or membership agreement. (Doc. 56 at 3-17.) Defendants argue that because the LOI is "subject to different interpretations" and "vague on multiple levels," the Court should consider parol evidence to determine the intent of the parties. (*Id.* at 9, 10.) Defendants further argue that the LOI itself does not reflect an intent to be bound because "its purpose is clearly outlined, essential terms of the alleged contract are missing, and the [LOI] even references further 'partnership agreements.'" (*Id.* at 14.) Defendants also argue that the LOI's reference to "additional partnership agreements" constitutes an express nonbinding clause and that "Arizona law will generally not entertain an action relating to a letter of intent that includes an express nonbinding clause." (*Id.* at 11.) Defendants alternatively argue that even if the LOI lacked an express nonbinding clause, the parties' conversations leading up to and immediately following the signing of the LOI indicate that any intent to be bound was contingent on the subsequent "execution of a partnership agreement." (*Id.* at 15.) Last, Defendants argue that the subsequent conduct of the parties—namely, their continued negotiations over the need to put in place a finalized partnership agreement, the decision not to issue Svec a Form-1065 K1 Statement, the decision not to grant Svec access to 21 Electronics' bank accounts, the failure to file Articles of Amendment with the Arizona Corporation Commission reflecting the change in ownership structure, as well as the overall supplier-distributor nature of the parties' subsequent relationship—underscores this conclusion. (*Id.* at 16.)

In reply, in addition to reiterating many of his earlier arguments, Svec argues that "Defendants' argument is flawed in a fundamental way: there is no express nonbinding clause in the contract" and "[n]othing in the document conditions finality on additional documents." (Doc. 58 at 2.) Svec also argues that although Defendants "try to cite parol evidence to argue that the contract was not binding," parol evidence is improper to consider here because "the contract is not reasonably susceptible to Defendants' interpretation." (*Id.* at 3-4.) Last, Svec argues that the circumstances surrounding the signing of the LOI "further demonstrate the parties' intent to treat the agreement as a sale of an interest in the business." (*Id.* at 9.)

1

2

B.    **Analysis**

1.    The April 30, 2024 Order

Before turning to the parties' summary judgment arguments, it is helpful to summarize the Court's basis for denying Svec's earlier motion for judgment on the pleadings.  At that early stage of the case, the Court concluded:

> [A]lthough Defendants admit in their answer that Davis signed the August 11, 2020 letter and then received a $30,000 payment from Svec, Defendants specifically deny Svec's allegation that, by doing so, Davis intended to and agreed to sell a 50% ownership interest in 21 Electronics, LLC to Svec. Davis also includes more detailed allegations on these topics in his counterclaim, asserting that (1) the parties did not intend the August 11, 2020 letter to be a binding contract, but rather only intended to be bound by the execution of a subsequent formal contract that never came to fruition; and (2) the $30,000 payment was ultimately treated as a payment for distribution rights, not as a payment for a partial interest in 21 Electronics, LLC.  If these allegations were directly contradicted by the August 11, 2020 letter, the Rule 12(c) analysis might be different, but they are not—among other things, the August 11, 2020 letter refers to itself as a "notice . . . to serve as a letter of intent," merely states that Svec will have a 50% interest in 21 Electronics, LLC "[a]t the conclusion of this sale/transaction," and states that "additional partnership agreements will be constructed and put into place" in the future. For purposes of Svec's motion, the Court must take Defendants' factual intent-to-contract allegations as true and reject Svec's contrary allegations. Because this analysis results in the conclusion that Defendants did not intend to treat the August 11, 2020 letter as a binding contract to sell a partnership interest to Svec, it follows that Svec is not entitled to judgment on the pleadings on his claim for an accounting under Arizona law—as noted, a prerequisite to such a claim is that Svec became a partner, member, or manager of 21 Electronics, LLC.

(Doc. 43 at 7-8, citations omitted.)

Given the procedural posture of the case at that time, the Court was required to accept Defendants' allegations regarding the intent of the parties.  *Elvig v. Calvin Presbyterian Church*, 375 F.3d 951, 955 (9th Cir. 2004).  But now that the case has reached the summary judgment stage, a more searching inquiry is required—one where mere allegations will not suffice.

…

1          2.      The LOI

Under Arizona law,[3] "[t]he purpose of contract interpretation is to determine the parties' intent and enforce that intent.  In order to determine what the parties intended, we first consider the plain meaning of the words in the context of the contract as a whole." *Grosvenor Holdings, L.C. v. Figueroa*, 218 P.3d 1045, 1050 (Ariz. Ct. App. 2009) (citations omitted).

The same standards apply when interpreting documents denominated as letters of intent.  *Johnson Int'l, Inc. v. City of Phoenix*, 967 P.2d 607, 614 (Ariz. Ct. App. 1998) (noting that although "generally the purpose [of a letter of intent] is not to bind parties to the ultimate contractual obligations," "[t]o determine whether the agreement binds anything, the court must look to the content of the letter and to the circumstances") (citing *Rennick v. O.P.T.I.O.N. Care, Inc.*, 77 F.3d. 309, 315 (9th Cir. 1996)).  On the one hand, "where there is an express nonbinding clause, we will honor it and not look to surrounding circumstances to imply an obligation at variance with the express clause." *Johnson Int'l, Inc.*, 967 P.2d at 614.  On the other hand, the mere fact that an agreement contemplates the execution of another, related agreement in the future does not render the initial agreement unenforceable.  *T. D. Dennis Builder, Inc. v. Goff*, 418 P.2d 367, 370 (Ariz. 1966) ("We approve of the principle that an agreement to make an agreement is not an enforcible [sic] contract when it does not set forth all the essential elements of the future contract.  However in the case at bar, nothing essential is left for future negotiation. . . .  If the parties wished to make their contract conditional upon the execution of the [future] trust agreement, then it was incumbent upon them so to state.  This court is loath to imply conditions into contracts which either make or break them.") (citation omitted).

---

[3]       The parties' briefing is ambiguous on the choice-of-law question.  Svec's motion suggests that either Arizona or Missouri law governs the parties' dispute.  (Doc. 53 at 10, 13, 18.)  Meanwhile, although Defendants' brief does not expressly address the choice-of-law question, it only cites Arizona cases and invokes "Arizona law" in support of Defendants' arguments.  (Doc. 56 at 11.)  Given this ambiguity, the Court asked the parties to clarify their positions during oral argument.  In response, Defendants' counsel stated that Arizona law applies, while Svec's counsel stated that although Missouri law applies, Arizona law is materially indistinguishable and compels the same outcome.  The Court thus applies Arizona law but notes the outcome would be the same under either state's law.

The LOI provides that "[a]t the conclusion of this sale/transaction," Svec and Davis will each be "50% Member/Owner[s]" of 21 Electronics.  (Doc. 53-1 at 34.)  This ownership interest, according to the terms of the LOI, includes "all inventory, assets, fixtures, intellectual property and equipment currently owned in entirety by Brett Davis, valued at $60,000," purchased for "the sum total amount of $30,000."  (*Id.*)  The plain meaning of this language is that the LOI contemplates a "sale/transaction" of 50% of 21 Electronics from Davis to Svec.  The LOI further provides that "[t]hese changes will be *effective as of the date of* the financial transaction of August 13, 2020 *following which* additional partnership agreements will be constructed and put into place."  (*Id.*, emphases added.)   The plain meaning of this language is that Davis and Svec agreed the "sale/transaction" of 50% of 21 Electronics as set forth in the LOI would be complete once Svec paid $30,000 to Davis, and following the completion of that sale, the parties would negotiate and agree to "additional partnership agreements."  Nothing about this provision indicates an express (or implied) intent not to be bound by the LOI, nor does it unambiguously condition the sale on the negotiation and execution of any "additional partnership agreements."

*Johnson*, which is the primary case on which Defendants rely, is distinguishable. There, the Arizona Court of Appeals held that an agreement denominated as a "memorandum of understanding" was not binding.  *Johnson*, 967 P.2d at 612.  The court placed particular emphasis on a clause within the memorandum containing the following language: "This memorandum is not intended to be the final agreement or to include all of the material terms, which shall be subject to further negotiations, and it shall not be binding on either party."  *Id.* at 609.  Similarly, in *Casa del Caffe Vergnano S.P.A. v. ItalFlavors, LLC*, 816 F.3d 1208 (9th Cir. 2016), the Ninth Circuit concluded that the parties did not evince an intent to be bound by a signed document in part because it contained the following clause: "This contract does not produce any effect between the parties, who as agreed will sign a future contract which will regulate their commercial relationship as soon as it is prepared . . . .".  *Id.* at 1210.

The LOI does not contain any remotely similar language. To the contrary, it expressly states that the "changes" contemplated by the LOI (*i.e.*, the transfer of a 50% ownership interest from Davis to Svec) will be "effective as of the date of the" $30,000 payment. Davis conceded during his deposition that the "financial transaction" referenced in the LOI was the $30,000 payment. (Doc. 53-1 at 16, 18.) As a result, the LOI was— despite its title—intended to constitute a binding agreement to transfer a 50% ownership interest in 21 Electronics to Svec upon Svec's payment of $30,000 to Davis.

### 3.    Extrinsic Evidence Of The Parties' Intent

The analysis as to the parties' intent could potentially end there. *See, e.g.,* *Grosvenor Holdings*, 218 P.3d at 1050 ("Where the intent of the parties is expressed in clear and unambiguous language, there is no need or room for construction or interpretation and a court may not resort thereto."); *In re Estate of Lamparella*, 109 P.3d 959, 963 (Ariz. Ct. App. 2005) ("A contract is not ambiguous just because the parties to it . . . disagree about its meaning. Language in a contract is ambiguous only when it can reasonably be construed to have more than one meaning."); *Shattuck v. Precision-Toyota, Inc.*, 566 P.2d 1332, 1334 (Ariz. 1977) ("It is not within the province or power of the court to alter, revise, modify, extend, rewrite or remake an agreement. Its duty is confined to the construction or interpretation of the one which the parties have made for themselves."). However, the Court is mindful of the need to "avoid the often irresistible temptation to automatically interpret contract language as he or she would understand the words," especially given the possibility that "exposition of the evidence regarding the intention of the parties will illuminate plausible interpretations other than the one that is facially obvious to the judge." *Taylor v. State Farm Mut. Auto. Ins. Co.*, 854 P.2d 1134, 1139-40 (Ariz. 1993) (cleaned up). Therefore, the Court now turns to the remaining evidence in the record to determine whether there is a genuine dispute of material fact over whether Svec and Davis intended to form a binding agreement (as Svec contends) or merely intended to condition the effectiveness of the LOI on the execution of subsequent partnership documents (as Defendants contend).

- 14 -

"Arizona does not adhere to the view that ambiguity must exist before parol evidence is admissible. Rather, the judge first considers the offered evidence and, if he or she finds that the contract language is reasonably susceptible to the interpretation asserted by its proponent, the evidence is admissible to determine the meaning intended by the parties." *Greyhound Lines Inc. v. Viad Corp.*, 260 F. Supp. 3d 1181, 1190 (D. Ariz. 2017) (citation omitted). In performing this inquiry, courts may "consider[] the evidence that is alleged to determine the extent of integration, illuminate the meaning of the contract language, or demonstrate the parties' intent." *Taylor*, 854 P.2d at 1139. "The acts of parties under a contract, before disputes arise, are the best evidence of the meaning of doubtful contractual terms." *Associated Students of the Univ. of Ariz. v. Arizona Bd. of Regents*, 584 P.2d 564, 569 (Ariz. Ct. App. 1978).

The Court begins with Davis's deposition testimony. Davis testified that he believed he and Svec were 50/50 partners as of August 18, 2020, a week after the parties signed the LOI and five days after Svec paid the $30,000. (Doc. 53-1 at 25 ["Q: And you did tell him, 'We are 50/50 partners,' correct? A: I did say that. Q: Did you mean it? A: At that time, believing that he was going to sign the document, yes. Q: So you did believe that you were 50/50 partners as of August 18, 2020? A: Yes."].) Davis also testified that he held the same belief as of December 3, 2020. (*Id.* at 29 [ "Q: What you said was 'You are 50 percent owner,' correct? A: That is what I believed *even though . . . he had not signed any official ownership—partnership papers*."].) These statements are inconsistent with Davis's current litigation position, which is that he and Svec could not become partners unless and until Svec executed additional partnership documents after executing the LOI. These statements, therefore, support the conclusion that Davis intended to be bound by the terms of the LOI and that those terms involved a transfer of a 50% interest in 21 Electronics to Svec upon Svec's payment of the $30,000.

The Court next turns to the parties' negotiations leading up to the execution of the LOI. In his July 11, 2020 email to Svec, entitled "Buy out discussion," Davis wrote that he and Svec "need *to agree* upon [] what is between [them]." (Doc. 56-2 at 3, emphasis

added.)  Davis referred to the needed agreement as constituting "a bill of sale from ME to you for $30K which constitutes 50% of XPIN/21-Electronics ownership." (*Id.*)  Davis went on to clarify that "this should cover the first step" of their business dealings before adding that "[t]he second step is to spell out our relationship, which can happen after step 1 is completed.  We both agree we are on the same page, which is a big plus, but just saying that doesn't make it so.  Too [sic] protect us both, we need to spell out the key points, particularly how we handle profit revenue, resellers, who is responsible for what, etc." (*Id.*) This email again suggests that Davis intended for the LOI to constitute a binding sale of 50% of 21 Electronics effective upon Svec's payment.  Indeed, the email suggests the parties were in agreement that "step 1" of their business dealings involved this sale of a 50% interest to Svec and that after that step was "completed," the parties would begin "step 2," which involved further formalization of the partnership.

The July 24, 2020 email exchange between Davis and Svec also supports this conclusion.  In his email to Davis, Svec sought details on "what $30k is getting [him]." (*Id.* at 3.)  Davis responded by breaking down 21 Electronics' assets and telling Svec that he "would own 50% of it." (*Id.* at 2.)  Rather than creating a genuine dispute of fact on the issue of intent, this exchange underscores that both parties understood that Svec's payment of $30,000 would result in a binding transfer of ownership.  In an effort to show otherwise, Defendants emphasize a single sentence of the email providing that "[p]laying the long game, we could state that when we organize, that we start with 10k total shares, each getting 5k, placing a dollar value of 6$ a share." (*Id.*)  But again, nothing about this sentence supports Defendants' interpretation; it only indicates that Davis and Svec were contemplating further formalization of their business relationship.  So too with the emails on July 27 and 28, 2020, wherein Davis sent Svec a draft partnership agreement and amendment.  (Doc. 56-3 at 2-17.)  Nothing in these emails or the attached agreements suggests that the parties only intended for the LOI to result in a binding transfer of a 50% ownership interest if the details of a partnership or membership were subsequently formalized.

Finally, the parties' conduct after they signed the LOI does not cast genuine doubt on Davis's intent to transfer 50% ownership of 21 Electronics to Svec upon Svec's payment.  For example, although no further formalized partnership documents had been signed, Davis repeatedly referred to Svec as an "equal partner" and "50 percent owner" of 21 Electronics, both to Svec and to third parties.  (Doc. 53-1 at 25, 27-29.)  In an email on September 3, 2020, Davis wrote to Svec expressing concerns about his end-of-year tax liability and the need to sign a formal partnership agreement, stating that "[w]e will need to file new articles [with the Arizona Corporation Commission] *stating* our partnership." (Doc. 56-3 at 2, emphasis added.)  Again, this suggests that Davis recognized the parties were already partners despite the absence of any executed documents beyond the LOI.  Nor do the differing responsibilities between the parties, which Defendants emphasize in their response brief, support Defendants' proposed interpretation.  For example, although Svec may have focused his efforts on distribution and lacked access to the 21 Electronics bank account, these facts are not inconsistent with the notion that the parties intended for the LOI to result in the transfer of a 50% ownership interest in 21 Electronics to Svec.

### 4.    Davis's Declaration And Svec's Motion To Strike

In an effort to provide additional extrinsic evidence in support of their interpretation of the LOI, Defendants attached Davis's declaration as an attachment to their response brief.  (Doc. 56-1.)  In it, Davis contends that he never intended for the LOI to constitute a binding agreement absent a later formalization of the partnership.  (Doc. 56-1 ¶ 11 [testifying that he "intended to make clear that the letter of intent was preliminary and not final until a final partnership agreement was 'put into place'"], ¶ 12 [stating that the LOI was "expressly conditioned on and would not constitute a binding agreement on me and Svec until we executed a final partnership agreement or membership purchase agreement memorializing the final terms of any business venture"].)

Svec moves to strike Davis's declaration, arguing that it contradicts his deposition testimony in a manner that triggers the sham affidavit doctrine.  (Doc. 57.)  In response, Defendants contend that Davis's deposition "was clear that he conditioned any belief

related to the August 11, 2020 letter on the assumption that the Parties were still negotiating and would execute a final agreement, which never occurred," that Davis's declaration does not contradict this deposition testimony, and that the sham affidavit doctrine is therefore inapplicable. (Doc. 59 at 3-6.) In reply, Svec argues that "nothing in the Declaration clarifies the . . . testimony regarding [Davis's] admission that he and [Svec] were partners and that [Svec] purchased a 50% interest in XPin on August 18, 2020" and that several paragraphs in the declaration flatly contradict Davis's deposition testimony. (Doc. 60 at 2-4.)

As an initial matter, it is doubtful that the challenged statements in Davis's declaration could provide support for Defendants' position even if they were properly before the Court. Under Arizona law, when there is a dispute in a contract case over whether the parties mutually assented to a material term (such as, in this case, whether the LOI created a binding obligation to transfer a 50% ownership interest in 21 Electronics to Svec upon Svec's payment of $30,000), "mutual assent [must be] based on objective evidence, not on the hidden intent of the parties." *Hill-Shafer P'ship v. Chilson Family Trust*, 799 P.2d 810, 815 (Ariz. 1990). The challenged statements in Davis's declaration amount to Davis's purported hidden intent, which he never expressed to Svec. *See also Helena Chemical Co. v. Coury Bros. Ranches, Inc.*, 616 P.2d 908, 913 (Ariz. Ct. App. 1980) ("[T]he undisclosed intent, motive or opinion of the signer is not admissible as evidence of the meaning of the written agreement. A contract is construed in accordance with the intention of the parties as judged by objective standards and not by their secret intentions or motives. Arizona courts have held [that it] is not the undisclosed intent of the parties with which we are concerned, but the outward manifestations of assent. . . . That courts should not be concerned with the undisclosed intent of the parties is made crystal-clear by a long line of decisions of our Supreme Court . . . .") (cleaned up); *Franklin Life Ins. Co. v. Mast*, 435 F.2d 1038, 1045 (9th Cir. 1970) ("Assuming, arguendo, then, that Mast did have a secret intent or motive, this would not prevent an enforceable contract

1    from emerging.").[4]

2        At any rate, "[t]he general rule in the Ninth Circuit is that a party cannot create an

3    issue of fact by an affidavit contradicting his prior deposition testimony." *Van Asdale v.*

4    *Int'l Game Tech.*, 577 F.3d 989, 998 (9th Cir. 2009) (quoting *Kennedy v. Allied Mut. Ins.*

5    *Co.*, 952 F.2d 262, 266 (9th Cir. 1991)). "This sham affidavit rule prevents a party who

6    has been examined at length on deposition from raising an issue of fact simply by

7    submitting an affidavit contradicting his own prior testimony, which would greatly

8    diminish the utility of summary judgment as a procedure for screening out sham issues of

9    fact." *Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012) (cleaned up). The sham

10    affidavit rule, however, "should be applied with caution because it is in tension with the

11    principle that the court is not to make credibility determinations when granting or denying

12    summary judgment." *Id.* (cleaned up). "[T]he non-moving party is not precluded from

13    elaborating upon, explaining or clarifying prior testimony elicited by opposing counsel on

14    deposition and minor inconsistencies that result from an honest discrepancy, a mistake, or

15    newly discovered evidence afford no basis for excluding an opposition affidavit." *Van*

16    *Asdale*, 577 F.3d at 999 (cleaned up). "Therefore, the Court will not apply the sham

17    affidavit doctrine where the non-moving party shows that a valid explanation exists for the

18    inconsistency." *Vinette v. Sun Health Corp.*, *2 (D. Ariz. 2006). "In order to trigger the

19    sham affidavit rule, the district court must make a factual determination that the

20    contradiction is a sham, and the inconsistency between a party's deposition testimony and

21    subsequent affidavit must be clear and unambiguous to justify striking the affidavit." *Van*

22    *Yeager,* 693 F.3d at 1080 (cleaned up).

23        Applying these standards, Davis's challenged statements in his declaration trigger

24    the sham affidavit doctrine. Those statements do not "clarify" Davis's deposition

25    testimony—they flatly contradict it. To refresh, during his deposition, Davis testified that

26    he believed he and Svec were partners as of August 18, 2020, a week after the parties

27

28    ─────────────

    [4]    During oral argument, Defendants' counsel agreed with the Court's "broader point
    that contract formation and intent is based on objective manifestations," not "a party's
    assertion of what was privately going through his mind."

signed the LOI and five days after Svec paid the $30,000.  (Doc. 53-1 at 25 ["Q: And you did tell him, 'We are 50/50 partners,' correct?  A: I did say that.  Q: Did you mean it?  A: At that time, believing that he was going to sign the document, yes.  Q: So you did believe that you were 50/50 partners as of August 18, 2020?  A: Yes."].)  However, in his declaration, Davis now belatedly claims that he only believed Svec would acquire a 50% interest in 21 Electronics if the parties executed further formal partnership documents following execution of the LOI.  This claim is clearly and unambiguously inconsistent with Davis's earlier deposition testimony and Defendants have not proffered a valid explanation for the inconsistency.  Indeed, Davis admitted during his deposition that he believed, as of December 3, 2020, that Svec was "50% owner" of 21 Electronics *even though . . . he had not signed any official ownership—partnership papers.*"  (Doc. 53-1 at 29, emphasis added.)  This is an unequivocal admission that Davis believed the binding effect of the LOI was not conditioned on a subsequent formalization of any partnership or LLC documents.  Consequently, to the extent Davis's declaration contradicts that admission, such testimony is stricken as a sham.[5]

        In an attempt to avoid application of the sham affidavit doctrine, Defendants point to the following portions of Davis's deposition:

Q:    You agreed to be bound by signing [the LOI], correct?

    . . .

A:    I agreed to move forward with the discussions in a partnership once it was fully formalized and defined.

    . . .

Q:    Did you agree with the terms of [the LOI] by signing it?

A:    As a letter of intent, I agreed as far as we continued the formalization of the partnership.

(Doc. 59-1 at 3.)

---

[5]    The sham statements appear in paragraphs 11, 12, 17, 22, 24, and 25.

1    In essence, Defendants argue these passages are consistent with Davis's declaration,

2    thereby precluding application of the sham affidavit doctrine.  (Doc. 59 at 3-6.)  This

3    argument is unavailing.  In the cited passages of his deposition, Davis did not testify that

4    he lacked any intent to be bound by the terms of the LOI, that the terms of the LOI did not

5    contemplate a transfer of 50% ownership of 21 Electronics to Svec, or that the transfer was

6    expressly contingent on a subsequent formalization of partnership documents.  To the

7    contrary, Davis's deposition testimony that he agreed to "move forward with the

8    discussions in a partnership once it was fully formalized and defined" is *consistent* with

9    Svec's proffered interpretation of the LOI, as well as with the plain language of the final

10   paragraph of the LOI, and is also consistent with Davis's admission elsewhere in his

11   deposition that he believed Svec was a 50% owner of 21 Electronics even though Svec had

12   not signed any subsequent partnership documents.  The same reasoning applies to Davis's

13   deposition testimony that he "agreed" to the LOI as "a letter of intent" and "as far as [the

14   parties] continued the formalization of the partnership."  As noted, a document's

15   denomination as a letter of intent does not necessarily render it nonbinding.  At no point

16   during his deposition did Davis claim—as he attempts to belatedly claim in his

17   declaration—that the LOI conditioned the 50% ownership transfer to Svec on the

18   formalization of subsequent partnership agreements.

19           5.    Purported Lack Of Essential Terms

20           Defendants also contend that Svec's request for summary judgment must be denied

21   because "essential terms of the alleged contract are missing." (Doc. 56 at 14.)[6]  Defendants

22   elaborate that "the letter of intent here is one page in length and does not include what

23   constitutes 'intellectual property,' 'equipment currently owned in entirety by Brett Davis,'

24   or 'XPin related products.'  The letter of intent also does not show how the Parties were to

25   split profits of 21 Electronics or how tax liability would be allocated.  Thus, the letter of

26

27   _____

     [6]    Although this argument is not developed in any depth in Defendants' brief, such
28   that it was not addressed in the tentative ruling issued before oral argument, Defendants'
     counsel emphasized this issue during oral argument and, upon reflection, Defendants did
     enough in their brief to avoid forfeiture.

1    intent expressly limits its purpose and is missing various essential terms to constitute a final

2    agreement." (*Id.* at 13-14.)  However, Defendants' brief does not cite any legal authority

3    in support of this argument and Defendants' counsel was unable to identify any supporting

4    authority during oral argument.  Meanwhile, Svec's counsel stated during oral argument

5    that this defense is unavailing because "I don't think that [the LOI] is missing anything that

6    is an essential term.  I think the essential terms are what is being sold and what is the

7    purchase price.  Those are the essential terms.  Anything else can be filled in."

8         Svec has the better of this argument.  The Restatement (Second) of Contracts § 33

9    (1981) provides that a contract may not be formed "unless the terms of the contract are

10   reasonably certain" and that "the terms of a contract are reasonably certain if they provide

11   a basis for determining the existence of a breach and for giving an appropriate remedy."

12   *Id.*  Arizona courts follow § 33.  *See, e.g.*, *Schade v. Diethrich*, 760 P.2d 1050, 1058 (Ariz.

13   1988) (relying on § 33 of the Restatement as expressing "settled principles of law").  "[A]s

14   the Restatement indicates, absent or uncertain terms are not fatal to the enforceability of an

15   otherwise binding contract." *Arok Const. Co. v. Indian Const. Services*, 848 P.2d 870, 876

16   (Ariz. Ct. App. 1993).  "The standard for contract enforceability is not whether the

17   agreement included a resolution of every matter and anticipated every contingency. . . .  If

18   a court can determine the existence of a breach by [the defendant] and fashion an

19   appropriate remedy for [the plaintiff], then the terms of their agreement are reasonably

20   certain and enforceable.  Thus, 'gaps' or omitted terms, or vague and indefinite terms, are

21   not invariably fatal to the rights of the parties to obtain enforcement of their bargain." *Id.*

22   at 876-77.

23        Arizona courts have applied these principles in a variety of circumstances to uphold

24   the validity of contracts despite the existence of missing terms.  In *Schade*, an employee

25   and employer orally agreed that the employee would be paid a "fair and equitable"

26   severance payment to be determined by a committee.  *Id.* at 1052-53.  The trial court held

27   that the parties had formed a valid and enforceable contract despite the existence of various

28   "missing terms" and the Supreme Court affirmed, emphasizing that under § 33(3) of the

1  Restatement, "the actions of the parties may show conclusively that they have intended to
2  conclude a binding agreement, even though one or more terms are missing or are left to be
3  agreed upon.  In such cases courts endeavor, if possible, to attach a sufficiently definite
4  meaning to the bargain." *Id.* at 1055, 1058.  Applying these principles, the court concluded
5  that because both parties "began performing within days of making the contract," such
6  performance supported the conclusion that the "offer and . . . acceptance were made with
7  contractual intent." *Id.* at 1059.

8       In *Arok*, a subcontractor sued a general contractor for breach of a bidding contract.
9  *Arok*, 848 P.2d at 872-73.   The general contractor argued the bidding contract was
10  unenforceable because "the parties failed to specify other terms essential to indicate their
11  intent to be bound: the manner and time of payments, penalty provisions, time for
12  completion, and bonding, . . . leaving gaps in the agreement." *Id.* at 875.  The trial court
13  held this contract was too indefinite to be enforced but the Arizona Court of Appeals
14  reversed, explaining that under § 33 of the Restatement, "[t]he terms of this contract are
15  sufficiently certain for two independent reasons.  First, [the general contractor] breached
16  the contract at a point when the only terms necessary to determine the existence of the
17  breach (scope of work) and for giving an appropriate remedy (agreed-upon price) were
18  present.  Second, there was evidence of a course of dealing involving a standard form
19  contract which could be used to supply any missing terms." *Id.* at 877.  The court added:
20  "The enforcement of incomplete agreements is a necessary fact of economic life.  Business
21  people are not soothsayers, and can neither provide in advance for every unforseen [sic]
22  contingency nor answer every unasked question regarding a commercial agreement.  This
23  is especially so with a complex contract for a major construction project.  Nor are
24  entrepreneurs perfect at drafting legal documents.  Finally, parties may want to bind
25  themselves and at the same time desire to leave some matters open for future resolution in
26  order to maintain flexibility.  Thus, courts are often presented with incomplete bargains
27  when the parties intend and desire to be bound." *Id.* at 876.

28       In light of these principles, the LOI is sufficiently definite to enforce.  First, the LOI

- 23 -

is more definite than the agreement in *Schade*. In *Schade*, the agreement omitted arguably the most central term—the amount of severance Schade was due—yet the Arizona Supreme Court still concluded the agreement was enforceable. *Arok*, 848 P.2d at 874 ("Our supreme court found that the *Schade* agreement sufficiently manifested mutual assent to be bound by contract despite the absence of agreement on the most basic terms of the severance package."). In contrast, the LOI contemplated a transfer of specific ownership interest in 21 Electronics—50% of the company—and also specified the exact sales price, the valuation of the company, the company's inventory, and the precise effective date. (Doc. 53-3 at 8.)

Defendants emphasize that the LOI did not go further by, for example, outlining the details of how profits would be distributed or specifying the parties' tax liabilities. Although Arizona courts do not appear to have directly addressed this issue, courts outside Arizona have held that such details are not essential to form a contract to transfer an ownership interest in an ongoing venture. *See, e.g.*, *Hand v. Starr-Wood Cardiac Group of Corvallis, P.C.*, 2001 WL 215803, *7 (D. Or. 2021) ("[P]laintiff alleges that the oral agreement included agreement on all of the following terms: 1) the parties; 2) plaintiff's title as director of cardiac surgery, as well as his duties in accordance with that title; 3) salary; 4) a bonus plan for cases over 150; and 5) a 51% ownership interest for plaintiff in the practice's profits. While these may not be all the terms of the contract, they are sufficient to constitute a meeting of the minds with respect to essential terms."); *N. Grp., Inc. v. Delancey Inv. Grp., Inc.*, 1993 WL 488598, *1-2 (E.D. Pa. 1993) (concluding that the following letter was sufficiently definite to "constitute[] a legally binding contract": "Pursuant to our recent conversations, the purpose of this letter is for us to mutually acknowledge that we agree that we will pursue the acquisition of 1600 Walnut Street on a joint basis in a partnership format on a 50/50 basis. It is understood that Delancey Investment Group, Inc. or its affiliates will be responsible for the day-to-day management and leasing of the property and will be compensated on a basis to be arranged by our partnership, and that we will jointly control of all major decisions concerning the

operations, financing, and disposition of the property."); *Field v. Golden Triangle Broadcasting, Inc.*, 305 A.2d 689, 690-94 (Pa. 1973) (concluding that a preliminary letter agreement for the purchase of a radio station was a binding contract, even though it expressly contemplated "the parties['] future agreement on a formal contract," did "not specify a closing date," and lacked "many other material terms and conditions that are customarily included in a contract for sale of a going concern," because "[i]t covers the purchase price, the downpayment to be made, the security to be given, a description of the assets to be sold, and numerous other details usually contained in contract").[7]  Furthermore, as discussed above, the rule in Arizona is that enforcement is permissible even when seemingly central terms are omitted so long as the contract contains enough details that the Court could "determine the existence of the breach" and "giv[e] an appropriate remedy" in the event of a disagreement.  *Arok*, 848 P.2d at 876-77.  Such is the case here with the

---

[7]       To be sure, courts outside Arizona have declined to enforce purported contracts for the sale of an ownership interest in an ongoing venture where the agreements lacked some of the missing details that Defendants emphasize here.  *See, e.g.*, *Massih v. Mulling*, 610 S.E.2d 657, 659 (Ga. Ct. App. 2005) (oral agreement to serve as president of new company in exchange for 20% ownership interest was unenforceable because "there were several details about the ownership that were never resolved," including "how CDI was to be structured"); *Lemming v. Morgan*, 492 S.E.2d 742, 744 (Ga. Ct. App. 1998) (oral agreement to locate, develop, and sell real estate in return for a 50% partnership interest was unenforceable because "[t]he agreement Lemming seeks to enforce had no specific provisions regarding . . . how or when development was to take place on any of the properties; how development or other costs of the ventures were to be allocated; how, when or by whom it would be decided whether the properties would be sold or whether one-half of Morgan's interests in the various properties would be transferred to Lemming; or how proceeds would be calculated"); *Held v. Zamparelli*, 431 N.E.2d 961, 962 (Mass. Ct. App. 1982) (oral agreement to refrain from exercising an option in return for "one-fourth of the profits from the operation of the premises" was unenforceable because "[t]he described agreement is silent on essential terms of the contract, such as, but scarcely limited to: when the plaintiff's share of the profits was to be computed and to be paid to her; the duration of the agreement under which she claims the right to a share of the profits; what was to occur if the property were sold; or what would be the plaintiff's responsibility should there be a claim against the owners of the property").  However, the purported contracts in those cases also omitted additional details that are not missing here.  *Massih*, 610 S.E.2d at 659 (agreement unenforceable in part because the parties "did not discuss when Massih would receive her ownership interest"); *Lemming*, 492 S.E.2d at 744 ("The agreement Lemming seeks to enforce had no specific provisions regarding when transfer of title . . . was to take place . . . ."); *Hastings Assocs., Inc. v. Loc. 369 Bldg. Fund, Inc.*, 675 N.E.2d 403, 411 (Mass. Ct. App. 1997) ("The judge's reliance upon *Held* . . . is misplaced.  In that case, among other things, the parties did not agree to the purchase price . . . .").  More important, those cases did not apply Arizona law, which, as discussed elsewhere in this order, allows enforcement even when seemingly central terms are omitted, at least where the parties began performing after execution.

- 25 -

1  LOI.[8]

2        Second, the enforceability calculus also turns on Svec's and Davis's conduct after

3  signing the LOI.  In the months after Svec and Davis executed the LOI and Svec made the

4  $30,000 payment contemplated by the LOI, Svec and Davis began engaging in business

5  operations together as contemplated by the LOI.  Among other things, Davis sent inventory

6  to Svec, Svec promoted XPin brands, and Svec was granted access to certain 21 Electronics

7  accounts.  Additionally, in January 2022, Davis began paying Svec some profits from XPin

8  sales.  Davis also repeatedly referred to Svec as a 50% owner and partner.  Such details

9  further support a finding of enforceability under Arizona law.  *Schade*, 760 P.2d at 1058-

10  59 (emphasizing that "the actions of the parties may show conclusively that they have

11  intended to conclude a binding agreement, even though one or more terms are missing or

12  are left to be agreed upon" and determining that a binding agreement was formed in part

13  because the parties "began performing within days of making the contract").  *See also In*

14  *re Loop 76, LLC*, 578 F. App'x 644, 646 (9th Cir. 2014) ("It is true that the financing letter

15  did not precisely lay down every term of the agreement.  But, under Arizona law, certainty

16  of terms goes to the question of whether the parties manifested assent or intent to be bound.

17  Here, Genesee delivered maintenance equipment with Loop's knowledge and approval,

18  indicating that the parties intended to form a binding agreement.") (citing *Schade*, 760 P.2d

19  at 1058); *Estate of Decamacho ex rel. Guthrie v. La Solana Care and Rehab, Inc.*, 316 P.3d

20  607, 610 (Ariz. Ct. App. 2014) (rejecting litigant's argument that "the admission agreement

21  lacks sufficient specificity and therefore cannot form a contract" in part because the parties

22  began performing after executing the agreement and "the fact that both parties have begun

23  performance is nearly always evidence that they regard the contract as consummated and

24  intend to be bound thereby") (cleaned up).

25

26  [8]    Additionally, as discussed in later portions of this order, the parties formed a general partnership for purposes of Arizona law.  This means that many of the alleged gaps in the

27  LOI emphasized by Defendants are filled by Arizona law.  For example, A.R.S. § 29-1031(B) provides that in a general partnership, "each partner is entitled to an equal share

28  of the partnership profits and is chargeable with a share of the partnership losses in proportion to the partner's share of the profits."

- 26 -

1

6.    <u>Conclusion</u>

2       None of Defendants' proffered evidence "illuminate[s] plausible interpretations

3  other than the one that is facially obvious to the judge." *Taylor*, 854 P.2d at 1139-40

4  (cleaned up).  The plain language of the LOI demonstrates that the parties intended to be

5  bound by the terms of the LOI and that those terms contemplated a transfer of a 50%

6  ownership interest in 21 Electronics to Svec conditioned only upon Svec's payment of

7  $30,000 to Davis.  It is undisputed that Svec made that payment.  Consequently, Svec's

8  motion for partial summary judgment as to Counts One through Four is granted, as is his

9  motion for summary judgment as to Count One of Defendants' counterclaim.

10      7.    <u>Contract Modification</u>

11      Svec also argues that because Davis believed he and Svec were partners after the

12 LOI was signed and the $30,000 was transferred, any attempt by Defendants to characterize

13 the parties' later conduct as an agreement that the $30,000 would be treated as a payment

14 for the right to distribute XPin products (rather than for a 50% ownership interest in 21

15 Electronics) would constitute an impermissible attempt at unilateral contract modification.

16 (Doc. 53 at 13-14.)  Svec further argues, in his motion to strike, that the portions of Davis's

17 declaration purporting to support this modification theory should be stricken under the

18 sham affidavit doctrine.  (Doc. 57 at 4-6.)

19      Defendants do not directly respond to Svec's modification argument—they merely

20 contend that the parties never agreed to be bound by the terms of the LOI and, regardless,

21 those terms conditioned the sale on the execution of subsequent "additional partnership

22 agreements."   However, Defendants also contend that the parties' course of dealing

23 demonstrates an implicit agreement to "repurpose" the $30,000 "as an acquisition of the

24 right to distribute XPin products" rather than as an acquisition of an ownership interest.

25 (Doc. 56 at 16.)  Defendants also argue, in response to Svec's motion to strike, that the

26 relevant portions of Davis's declaration do not "flatly contradict" Davis's deposition

27 testimony, "but instead are consistent with [Davis's] recollection of how the Parties'

28 relationship developed over the following 18 months."  (Doc. 59 at 5-6.)  In reply, Svec

argues that because Davis "admitted in his deposition testimony that [Svec] never agreed that he would be treated as anything but a partner," Davis's declaration testimony to the contrary should be stricken as a sham, and without that declaration testimony, it is undisputed that the parties never agreed, by conduct or otherwise, to modify their relationship. (Doc. 58 at 4-5.) Svec also reiterates these arguments in his reply in support of his motion to strike. (Doc. 60 at 3-4.)

In Arizona, "[o]nce a bilateral contract is formed, its terms cannot be modified absent an additional offer, acceptance, and consideration." *Cornell v. Desert Fin. Credit Union*, 524 P.3d 1133, 1136 (Ariz. 2023). "An offer has no binding effect unless and until accepted by the offeree to whom the offer was directed." *Goodman v. Physical Res. Eng'g, Inc.*, 270 P.3d 852, 855 (Ariz. Ct. App. 2011).

Defendants do not expressly argue that Svec and Davis agreed to modify the terms of their agreement as set forth in the LOI, as they deny that any such agreement was ever formed. Nevertheless, having concluded in the previous section that the parties mutually agreed to the terms of the LOI, which, upon Svec's payment, made him a 50% owner of 21 Electronics, the only possible interpretation of Defendants' "agreement by conduct" argument is that such conduct constituted a modification of the LOI. The Court agrees with Svec that nothing in the record supports this argument. In fact, at several points during his deposition, Davis admitted that Svec never agreed to any arrangement in which his $30,000 payment would be repurposed as the purchase of a right to distribute rather than the purchase of a 50% ownership interest. (Doc. 53-1 at 30-31 ["Q: And did Mr. Svec agree that the $30,000 was going to—rather than be an ownership interest, that he was merely purchasing a right to distribute XPin product? A: He did not agree to that. Q: Okay. So really he's never agreed to that; is that correct? . . . . A: Correct. Q: Okay. So the only person who decided that the $30,000 was not going to be for purchase of an interest in 21 Electronics but rather was going to be a right to distribute, the only person who agreed to that was you, correct? A: Yes."]. *See also id.* at 32-33 ["Q: Okay. Did he ever say he would only be a reseller? A: No."].).

The only evidence cited by Defendants that could even potentially support this agreement-by-conduct theory is Davis's declaration, wherein he testifies that "[o]ver the course of our dealings, rather than acquiring the interest in 21 Electronics, through our conduct, Mr. Svec and I mutually agreed that Mr. Svec would be considered a re-seller with special considerations, and Mr. Svec would be paid a share of profits from the sale and distribution of XPin products"; that "[t]he $30,000 paid by Mr. Svec to me was treated as a payment to acquire the non-exclusive right to distribute XPin product through Mr. Svec's separate company Big Daddy Enterprises"; and that "[t]hroughout all of 2021, my dealings with Mr. Svec were more associated with that of a reseller or distributor rather than a partnership." (Doc. 56-1 ¶¶ 24-26.)  However, these passages flatly contradict Davis's earlier deposition testimony.  During his deposition, Davis admitted that Svec never agreed that his $30,000 would serve as anything other than a payment for a 50% interest in 21 Electronics.  Defendants' attempt to proffer a subsequent declaration from Davis testifying to the contrary is a sham.  Consequently, Svec's motion to strike with respect to these paragraphs is granted.

Defendants point to nothing else in the record supporting their contention that Svec and Davis agreed to modify the terms of their agreement through their conduct.  True, Svec subsequently distributed XPin products and lacked access to the 21 Electronics bank account, but as noted, these facts are not inconsistent with the notion that Svec acquired a 50% ownership interest after making the $30,000 payment.  For effectively the same reason, these facts do not suggest that Svec and Davis silently agreed to modify the terms of their initial agreement, so as to treat Svec's $30,000 payment as payment for a right to distribute rather than as a payment for a 50% ownership interest.  Nor do Defendants provide any law suggesting that a valid modification could occur under these circumstances.[9]

…

---

[9]     If that were not enough, Defendants fail to produce any evidence that the alleged agreement to modify the terms of the LOI was supported by consideration.  *Cornell*, 524 P.3d at 1136.

- 29 -

III.    <u>Accounting</u>

In Count Seven of the Complaint, Svec alleges that Davis "had general operational control over banking, product procurement, and other operational matters of the partnership" and that "[b]y refusing to provide [Svec] with records repeatedly requested by [Svec], [Davis] has violated his duty to provide an accounting."  (Doc. 1 ¶¶ 106-07.) Defendants deny these allegations.  (Doc. 25 at 6 ¶¶ 59-61.)

A.    **The Parties' Arguments**

Svec argues he is "entitled to an accounting for the business from [Davis]" because he "purchased one-half of the XPin brand and a 50% interest in 21 Electronics, LLC, from [Davis]" and "whether the business is a partnership or an LLC, [Svec's] 50% interest in the business therefore entitles him to an accounting of it and/or its records."  (Doc. 53 at 17-18.)  Svec further argues that "even if [he] was not properly admitted as a member of 21 Electronics, LLC, he and [Davis] formed a partnership under the standards of either Arizona or Missouri law" and he is therefore entitled to an accounting.  (*Id.* at 18.)  In response, Defendants only dispute whether Svec ever acquired 50% ownership in 21 Electronics or whether the parties ever formed a partnership.  (Doc. 56.)  Defendants do not dispute that, assuming such a partnership was formed, Svec would be entitled to an accounting.  (*Id.*)  In reply, Svec reiterates that he acquired a 50% ownership interest in 21 Electronics.  (Doc. 58 at 1-11.)

B.    **Analysis**

Under Arizona law, absent exceptions that are inapplicable here, "the association of two or more persons to carry on as co-owners a business for profit forms a partnership, whether or not the persons intend to form a partnership."  A.R.S. § 29-1012(A). Additionally, A.R.S. §§ 29-1035(B) and 29-1033(B) allow "[a] partner" to "maintain an action against the partnership or another partner," including for "access to [the partnership's] books and records."  Thus, to prevail on his summary judgment motion on Count Seven, Svec would need to show that he entered into a partnership with Davis and that Davis failed to provide an accounting.

Svec has made both showings.  First, for all of the reasons outlined in earlier portions of this order, Svec acquired a 50% ownership interest of 21 Electronics via the LOI and his payment of $30,000 to Davis.  Svec acquired this ownership interest to operate, alongside Davis, a for-profit business.  (Doc. 53-1 at 34 [providing that the sale is being conducted "for the development of XPin related products"].)  Then, for over two years, the parties conducted business for a profit and shared those profits.  This constitutes a partnership under Arizona law, whether the parties intended it or not.[10]  Second, although Svec does not specifically identify how Davis failed to provide him with an accounting, Defendants concede in their response brief that "Svec never had access to the bank accounts for 21 Electronics."  (Doc. 56 at 16.)  Svec's motion for summary judgment as to Count Seven is therefore granted.  *See also Smith v. Dellaripa*, 2024 WL 3456950, *4 (Ariz. Ct. App. 2024) ("A ruling denying access to records Smith had a statutory right to access is an error of law and thus an abuse of discretion.").[11]

…

…

…

…

…

…

…

…

…

---

[10]    Svec also points to evidence in the record supporting Davis's intent to form a partnership.  (Doc. 53-1 at 25 ["Q: Okay.  And did you tell him, 'We are 50/50 partners,' correct?  A: I did say that.  Q: Did you mean it?  A: At the time, believing that he was going to sign the document, yes."]; *id.* at 27 ["Q: Well, you say in here that you're equal partners, correct?"  A: Again, as we've already discussed, it was what was desired and we would operate as such until it can no longer be considered, and that time was coming."].)

[11]    Given the parties' limited briefing on this claim, this ruling is narrow—the Court holds only that Svec is entitled to an accounting and expresses no opinion as to what such an accounting will entail or who must pay for it.  To the extent the parties have any disagreement over those issues, they must meet and confer before seeking any further relief from the Court.

Accordingly,

**IT IS ORDERED** that:

1.      Svec's motion for summary judgment (Doc. 53) is **granted**.

2.      Svec's motion to strike (Doc. 57) is **granted**.

3.      The parties must meet and confer and then file, by Augst 6, 2025, a joint notice that either (1) requests a referral to a magistrate judge for a settlement conference; or (2) requests the setting of a firm trial date.  If the parties request the setting of a firm trial date, the joint notice must also indicate the estimated length of trial and propose at least three dates on which the parties and their witnesses will be available to begin trial in or after December 2025.

Dated this 23rd day of July, 2025.

Dominic W. Lanza
United States District Judge